James H. Power
Marie E. Larsen
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Telefax: 212-385-9010
Email: james.power@hklaw.com
        marie.larsen@hklaw.com

*Attorneys for Plaintiff*
*Bonny Gas Transport Limited*



**14 cv 9542**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BONNY GAS TRANSPORT LIMITED,
as owner of the LNG FINIMA (IMO No. 7702401)

                                        Plaintiff,

- against -

O W. BUNKER GERMANY GMBH. NUSTAR
TERMINALS MARINE SERVICES N.V.,
NUSTAR ENERGY SERVICES. INC , ING
BANK N.V.

                                        Defendants

**COMPLAINT
FOR INTERPLEADER**

Plaintiff Bonny Gas Transport Limited ("Bonny Gas") individually and as owner of the

vessel LNG FINIMA. by and through its attorneys Holland & Knight LLP brings this action

pursuant to Rule 9(h). as and for its Complaint for Interpleader pursuant to 28 U.S.C. §§ 1335(a)

and 2361 alleges, upon information and belief, as follows:

## THE PARTIES

1.      Bonny Gas is a foreign corporation or business entity organized and existing

pursuant to the laws of a foreign country.

2.      The vessel LNG FINIMA (IMO No. 7702401) (the "Vessel") is a party in interest in this proceeding as it is the subject of one or more lien claims against it *in rem*.  The LNG FINIMA is a Bermuda-flagged liquefied natural gas carrier owned by Bonny Gas.

3.      Nigeria LNG Ltd. is a party in interest related to the vessel owner and at all material times was the time charterer of the LNG FINIMA.  Nigeria LNG Ltd. is a company organized and existing pursuant to the law of a foreign country, with its principle place of business in Port Harcourt, Nigeria.

4.      Defendant O.W. Bunker Germany GMBH ("O.W. Germany") is a corporation or business entity organized and existing pursuant to the laws of Germany, with an office and place of business at Neumülhen 11, D-22763 Hamburg, Germany.

5.      Defendant NuStar Terminals Marine Services N.V. ("NuStar Terminals") is a corporation or business entity organized and existing pursuant to the laws of the Netherlands Antilles, with an office and place of business at Tumbledown Dick Bay, St. Eustatius, Dutch Caribbean.

6.      Defendant NuStar Energy Services, Inc. ("NuStar USA") is a corporation or business entity organized and existing pursuant to the laws of Delaware, with an office and place of business at 281 Highway Drive, San Antonio, Texas 78219.

7.      Defendant ING Bank N.V. ("ING") is a bank organized and existing pursuant to the laws of the Netherlands with an office and place of business located at Amsterdamse Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and Fed.R.Civ.P. 9(h), inasmuch as it involves the interpleader of funds in the possession of Bonny

Gas for the payment pursuant to a bunker supply contract for the provision of necessaries (i.e., fuel oil or bunkers) to the vessel LNG FINIMA.

9.      This Court has jurisdiction over this interpleader action pursuant to 28 U.S.C. § 1335(a) in that for the bunker payment in question: (a) at least two of the claimants are of diverse citizenship; (b) the dispute between the claimants involves funds in an amount exceeding $500.00, exclusive of interest and costs; and (c) Bonny Gas, as owner of the LNG FINIMA is the stakeholder of the funds and, concurrently with the filing of this Complaint, will seek to make a deposit in the Court's Registry in the sum of at least $2,459,787.20, which is the invoiced amount for the fuel delivered to the LNG FINIMA on November 1, 2014.

10.     This Court has personal jurisdiction over defendant O.W. Germany pursuant to the terms of the applicable bunker supply contract and O.W. Group Standard Terms and Conditions.  Additionally, O.W. Germany performed parts of the bunker supply contract in the United States through one or more U.S. based O.W. affiliates, including but not limited to O.W. USA, Inc.

11.     This Court has personal jurisdiction over defendant NuStar Terminals because NuStar Terminals has submitted to the jurisdiction of the U.S. Courts with respect to the bunker contract at issue, by its application for a warrant of arrest of the Vessel in the Western District of Louisiana.[1]   Service may therefore be effected pursuant to 28 U.S.C. § 2361 on NuStar Terminals' counsel of record.

12.     This Court has personal jurisdiction over defendant NuStar USA pursuant to 28 U.S.C. § 2361.

---

[1] *NuStar Terminals Marine Services, N.V. v. LNG FINIMA*, Civ. No. 14-3335 (W.D. La.)

13.     This Court has personal jurisdiction over ING Bank N.V. to the extent it is or may be a third-party beneficiary of the bunker supply contract at issue in this dispute and to the extent that it is an alleged assignee of the receivables of O.W. Germany and other O.W. Bunker entities. Additionally, ING transacts business within the jurisdiction of this Court.

14.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1397.

## NATURE OF ACTION

15.     This is an action for interpleader with respect to the sum of $2,459,787.20, representing the amount due under an invoice for the supply of bunkers to the vessel LNG FINIMA. With respect to payment of the invoice, O.W. Germany, NuStar Terminals, NuStar USA, ING Bank N.V. or some other third party may have conflicting claims as to ownership of the funds owed by Bonny Gas for the purchase of and receipt of a quantity of bunkers (fuel) in the Port of St. Eustatius for the vessel LNG FINIMA, delivered to the Vessel on November 1, 2014 (the "Fuel Delivery").

## FACTUAL BACKGROUND

16.     Bonny Gas, owner of the Vessel or its charterer, Nigeria LNG Limited (a related entity to Bonny Gas and party of interest in this action) ordered bunkers to be loaded onboard the Vessel from O.W. Germany. O.W. Germany is a corporate affiliate of O.W. USA Inc., O.W. North America Inc. and O.W. Holding North America, Inc. The bunkers were supplied to the Vessel within the Port of St. Eustatius, located in the Netherlands Antilles.

17.     The bunkers were delivered to the Vessel on November 1, 2014. A bunker delivery receipt was issued by NuStar Terminals. A true copy of the bunker delivery receipt is attached hereto as Exhibit 1.

4

18.     Upon information and belief, NuStar Terminals delivered the bunkers pursuant to a sales agreement between NuStar Terminals and O.W. Bunker USA Inc. ("O.W. USA").[2]

19.     An invoice for the Fuel Delivery was issued to the vessel LNG FINIMA and/or Bonny Gas and/or its charterer Nigeria LNG Ltd. on November 1, 2014 by O.W. Germany for the supply of bunkers.  The invoice directs payment of $2,459,787.20 to O.W. Germany with payment to be made to an ING account.  A true copy of the Fuel Delivery invoice is attached hereto as Exhibit 2.

20.     The standard terms and conditions of all OW Bunker entities for the sale of bunkers includes clause P.5: "Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim aris[ing] in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York."  A true copy of the OW Bunker terms is attached hereto as Exhibit 3.

21.     On November 7, 2014, O.W. Bunker AS ("O.W. Denmark") and certain of its Danish subsidiaries and affiliates filed for bankruptcy in their home jurisdiction of Denmark.

22.     On or about November 13, 2014, O.W. USA Inc., O.W. North America Inc. and O.W. Holding North America Inc. ("O.W. USA", "O.W. North America" and "O.W. Holding", respectively) all filed voluntary petitions pursuant to Chapter 11 in the United States Bankruptcy Court for the District of Connecticut as Case Nos. 14-51720, 14-51721 and 14-51722.

---

[2] Civ. No. 14-3335 (W.D. La) Complaint at ¶7.

23.     Neither Bonny Gas as owner or Nigeria LNG Ltd. as charterer had any contracts or dealings directly with O.W. USA, O.W. North America or O.W. Holding and does not believe any of these entities has a claim against the interpleader funds.[3]

24.     Pursuant to an Omnibus Security Agreement dated December 19, 2013 between O.W. Bunker & Trading A/S and its subsidiaries (believed to include O.W. USA, O.W. North America and O.W. Holding), and ING as Security Agent, the O.W. entities have allegedly assigned certain rights in respect of their supply contracts as security to ING.

25.     Due to the bankruptcy filings of O.W. Denmark, O.W. USA, O.W. North America and O.W. Holding, NuStar Terminals, NuStar USA and ING have sought or are expected to seek to collect amounts allegedly owed to them arising from or related to the supply of bunkers to the Vessel.

**POSSIBLE ARREST OF VESSEL AND NECESSITY OF INTERPLEADER**

26.     Under United States maritime law, the contract supplier of necessaries (such as O.W. Germany), including fuel, to a vessel obtains a maritime lien against that vessel. Additionally, under certain circumstances, a physical supplier of the fuel (such as NuStar Terminals) may also assert a maritime lien on that vessel.

27.     Moreover, other parties, such as ING, may be expected to assert a right to the bunker payment based on ING's numerous demands for payment in other cases.   Upon information and belief ING's claims are based on assignments of receivables by various O.W.

---

[3] While the Chapter 11 O.W. entities are not defendant-claimants in this action, even if they were to be later joined as claimants, Bonny Gas respectfully submits that this interpleader action would not violate the automatic stay imposed by the Bankruptcy Code, 11 U.S.C. § 362. *See Price & Pierce Int'l, Inc v. Spicers Int'l Paper Sales, Inc*, 50 B.R 25, 26 (S.D.N.Y. 1985) (as debtor was in reality nominal defendant in interpleader action, interpleader action did not violate automatic stay).

entities including but not limited to O.W. Germany.  A true copy of an ING demand for payment to a vessel owner pursuant to the Omnibus Security Agreement is attached hereto as Exhibit 4.

28.     The Vessel is due to call at various ports in the United States and could face arrest pursuant to Supplemental Admiralty Rule C by any of the defendants claiming to assert a maritime lien,[4] which would cause harm to Plaintiff, delay the Vessel, affect innocent third parties with interests in the Vessel's cargo and generally inhibit maritime commerce.

29.     Indeed, on November 25, 2014, NuStar Terminals filed an action in the Western District of Louisiana to arrest the vessel LNG FINIMA pursuant to Supplemental Admiralty Rule C, asserting a maritime lien against the vessel for amounts due for the supply of bunkers to the Vessel.  *NuStar Terminals Marine Services, N.V. v. LNG FINIMA*, Civ. No. 14-3335 (W.D. La).  A true copy of the Verified Complaint, Order and Warrant of Arrest are attached hereto as Exhibit 5.

30.     Defendant NuStar USA, through its U.S. Counsel Blank Rome LLP has proposed to Bonny Gas a substitute security agreement in exchange for NuStar refraining from arresting the Vessel.  NuStar USA's current proposal is that Bonny Gas deposit $2,456,997.27 in trust with NuStar USA by December 8, 2014 as substitute security pursuant to Supplemental Admiralty Rule E.  This proposal is unacceptable to Bonny Gas as it is in favor of only NuStar USA and does not prevent further arrest or attachment of the Vessel for a claim by O.W. Germany or ING for this Fuel Delivery.

31.     Upon information and belief, NuStar Terminals and NuStar USA are subsidiaries of NuStar Energy, L.P., a Delaware corporation.  Upon information and belief, NuStar USA is

---

[4] Bonny Gas makes no assertion nor takes a position as to the validity of any of the potentially asserted maritime liens or other claims by any of the Defendants or whether O.W. Germany has validly assigned any maritime lien claim to ING.  This issue is a matter to be decided by the District Court or other court having jurisdiction over the underlying claims by and between the claimants.

collecting amounts owed to NuStar Terminals, as demonstrated by NuStar USA's proposed substitute security agreement in the arrest action initiated by NuStar Terminals.

32.     Bonny Gas presently has control over the funds invoiced for the Fuel Delivery to the Vessel.  Bonny Gas disclaims any interest in the amount invoiced for the supply of bunkers to the Vessel.

33.     Bonny Gas cannot ascertain whether the amount owed for the Fuel Delivery should be paid to O.W. Germany, NuStar Terminals, NuStar USA or ING in order to extinguish all maritime liens and/or other claims against Bonny Gas, Nigeria LNG Ltd. and the Vessel and to prevent the Vessel's arrest in this District or elsewhere and claims for payment on the Fuel Delivery against Bonny Gas and Nigeria LNG Ltd.

34.     The competing claims of the Defendants or other third parties may expose Bonny Gas, Nigeria LNG Ltd. and the vessel LNG FINIMA to multiple liability in connection with the payment of the bunker invoice in order to extinguish competing maritime lien claims and/or other *in personam* or non-maritime claims.

35.     Bonny Gas as owner of and acting on behalf of the vessel LNG FINIMA and Nigeria LNG Ltd. is entitled to deposit with the Court the sum of at least $2,459,787.20, representing the amount due pursuant to the bunker invoice for the Fuel Delivery, and require that O.W Germany, NuStar Terminals, NuStar USA, ING and any other claimant interplead among themselves to establish their respective rights to the invoice funds.

36.     Further, in order to comply with the requirements of Supplemental Admiralty Rule E(5)(a) and for the funds deposited into the registry to constitute security for the *in rem* claims of the claimants and to act as the substitute *res* against which claimants must assert their maritime liens for the Fuel Delivery, Bonny Gas is prepared to deposit an additional amount

constituting 6% interest per annum or such other amount as the court deems just and proper. This amount is calculated to be $2,607,374.43, inclusive of one year of interest, and exceeds the amount of security currently demanded by NuStar Terminals and/or NuStar USA in the Louisiana arrest action.

37.     After depositing the sum of $2,607,374.43 with the Court, Bonny Gas and Nigeria LNG Ltd. are entitled to be discharged from further liability with respect to the funds and liability for payment for the Fuel Delivery. The Vessel is similarly entitled to be discharged from any maritime lien against it arising from the Fuel Delivery as described herein and as reflected in Exhibits 1 and 2.

WHEREFORE, Plaintiff Bonny Gas, as owner of the vessel LNG FINIMA respectfully requests that this Court:

(i)     determine which of the defendants is entitled to the Fuel Delivery funds, or, in the alternative, the share of each defendant, if any;

(ii)     enjoin O.W. Bunker Germany GMBH, NuStar Terminals Marine Services N.V., NuStar Energy Services, Inc. and ING Bank, N.V. from commencing any action against Bonny Gas Transport Limited or the vessel LNG FINIMA *in rem*, including but not limited to the arrest of the Vessel in any port, pursuant to Supplemental Admiralty Rule C based on the assertion of any *in rem* claim for the provisions of the bunkers referred herein as the Fuel Delivery;

(iii)     discharge Bonny Gas Transport Limited from any liability on any claim that has been made or may in the future for the Fuel Delivery upon Bonny Gas's deposit of $2,607,374.43 into this Court's registry;

(iv)    discharge Nigeria LNG Limited as charterers of the vessel LNG FINIMA at the time of fuel delivery,  from any liability on any claim that has been made or may in the future for the Fuel Delivery upon Bonny Gas's deposit of $2,607,374.43 into this Court's registry;

(v)    discharge the vessel LNG FINIMA from any liability on any claim that has been made or may in the future be made for the Fuel Delivery upon Bonny Gas's deposit of $2,607,374.43 into this Court's registry;

(vi)    award Bonny Gas Transport Limited its costs and attorneys' fees in this action; and

(vii)    award Bonny Gas Transport Limited such other and further relief which this Court may deem just and proper.

Dated:  New York, New York
        December 3, 2014

                                        HOLLAND & KNIGHT LLP


                                        By: _____
                                        James H. Power
                                        Marie E. Larsen
                                        31 West 52nd Street
                                        New York, New York 10019
                                        Telephone:  212-513-3200
                                        Telefax: 212-385-9010
                                        Email:  james.power@hklaw.com
                                                marie.larsen@hklaw.com

                                        *Attorneys for Plaintiff Bonny Gas Transport Limited*

#34148236_v1

# EXHIBIT 1



**MARINE FUEL DELIVERY NOTE**

Tumbledown Dick Bay
St. Eustatius
Dutch Caribbean
Phone: 599-318-2300
Fax: 599-318-2259
E-Mail: bunkers@nustarenergy.com

**NuStar Terminals Marine Services N.V.**

| VESSEL NAME: | IMO NO. | DATE: |
|---|---|---|
| LNG FINIMA | 7702401 | Oct-31-2014 |
| DELIVERY LOCATION: | ORDER NO. | AGENT: |
| St Gustatius | 0040213267 | 7-Seas |
| BARGE NAME / DOCK# / OTHER: | | |
| Statia Navigator | | |

| PRODUCT | GROSS BBLS | NET BBLS | TEMP. | WEIGHT METRIC TONS |
|---|---|---|---|---|
| IFO 380 | 23228 | 22931 | 99.1 | 3599.932 |
| | | | | |

| GRADE | VISCOSITY INDEX CST 50°C | WATER | DENSITY | FLASH POINT (°C) | POUR POINT (°C) | SULFUR (% W/W) | WATER (% V/V) | MCR (% W/W) | VANADIUM (mg/kg) | CETANE NO. (INDEX) |
|---|---|---|---|---|---|---|---|---|---|---|
| IFO380 | 277.00 | 11.5 | 988.5 | 181 | 16 | 1.97 | 0.200 | 13.33 | 70 | 0 |
| | | | | | | | | | | |

| ** The above specifications are only to be used as typical only (with the exception of sulfur)** |
|---|

| SAMPLES/SEAL # | IFO 380 | IFO | MGO/MDO |
|---|---|---|---|
| SHIP | 1377990 | | |
| NTMS #1 | 1377994 | | |
| NTMS #2 | 1377993 | | |
| MARPOL – SHIP | 1377988 | | |
| MARPOL - SUPPLIER | 1377985 | | |

| | YES | NO |
|---|---|---|
| VESSEL REPRESENTATIVE WINTNESSED SAMPLING | ☐ | ☒ |
| VESSEL REPRESENTATIVE WITNESS GUAGING/METER | ☐ | ☒ |

ANY DISCLAIMER BY THE PURCHASER OF THE MARINE FUELS COVERED BY THIS NOTE WILL HAVE NO FORCE OR EFFECT, REGARDLESS OF WHETHER THE DISCLAIMER IS IN THE FORM OF A STAMP, A HANDWRITTEN STATEMENT, OR ANY OTHER FORM. WITHOUT LIMITING THE FOREGOING, NO DISCLAIMER BY THE PURCHASER OF THE MARINE FUELS COVERED BY THIS NOTE WILL ALTER OR WAIVE: THE INFORMATION CONTAINED IN THIS NOTE; THE SELLER'S MARITIME LIEN AGAINST THE RECEIVING VESSEL FOR THE COST OF THE MARINE FUELS COVERED BY THIS NOTE; OR THE RECEIVING VESSEL'S LIABILITY FOR THE COST OF THE MARINE FUELS COVERED BY THIS NOTE.

THE SAMPLE RETAINED BY SELLER WILL BE DEEMED THE ONLY REPRESENTATIVE SAMPLE OF THE MARINE FUELS COVERED BY THIS NOTE. NO SAMPLE RETAINED BY THE PURCHASER MAY BE USED AS EVIDENCE IN ANY LEGAL PROCEEDING ARISING OUT OF THE SALE OF MARINE FUELS TO WHICH THIS NOTE IS RELATED.

SUPPLIER CONFIRMS THAT THE FUEL OIL DELIVERED CONFORMS TO REGULATIONS 14 AND 18 OF ANNEX VI OF MARPOL 73/78.

_____
NuStar Terminals Marine Services NV.

**LNG FINIMA**
OFFICIAL NO. 715334
Master / Chief Engineer   GRT: 89710   NRT: 25684
SHP. 40800
_____
Master / Chief Engineer

# **EXHIBIT 2**



M/V LNG FINIMA
AND/OR OWNERS/CHARTERERS

Nigeria LNG Ltd.
The General Manager, Finance
ISB/OSBI
Amadi Creek, Off Eastern Bypass
Port Harcourt, Rivers State
Nigeria

PORT ST EUSTATIUS
YOUR REFERENCE

| | | |
|---|---|---|
| DATE OF INVOICE | : | 01. November 2014 |
| INVOICE NO | : | 119-29518 |
| ORDER NO | · | 119-28332 |
| DATE OF SUPPLY | : | 01 November 2014 |
| DUE DATE | : | 01. December 2014 |

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 3 599 937  MT | Fueloil 380-CST 3,5% | 658,75  MT | 2 371 458,50 |
| 80 026  MT | Gasoil | 1 103,75  MT | 88 328,70 |

| Our VAT No | DF-814847085 | Total | USD | 2 459 787,20 |
|---|---|---|---|---|

The prices are excl all taxes and/or other fees

TERMS OF PAYMENT 30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

| | | | |
|---|---|---|---|
| BANK: | ING Bank N V | | O W BUNKER GERMANY GMBH |
| | | | Neumuhlen 11 |
| ACCOUNT: | IBAN  NL26 INGB 0020 1180 31 | USD and all other currencies | |
| | IBAN  NL10 INGB 0651 3696 81 | EUR | D-22763  Hamburg |
| | SWIFT  INGBNL2A | | Phone  +49 40 3255900 |
| | | | Fax  +49 40 330471 |
| | | | Tax No / Steuer Nr  41/768/03458 |
| | | | E mail trading@owbunker de |
| | | | Internet  http //www owbunker com |
| Per telegraphic transfer directly to our account without deduction | | | Managing director Gotz Lehsten |
| of bank charges which are for buyers account | | | HR B 100089 |

# EXHIBIT 3

# OW BUNKER GROUP

## Terms and Conditions of sale for Marine Bunkers
## Bunkers
## Edition 2013

**A**      **GENERAL INTRODUCTION**

A 1      This is a statement of the terms and conditions according to which the
         International O W  Bunker Group (hereinafter called  OWB ) will sell marine bunkers

A 2      These conditions apply to all offers  quotations  orders  agreements  services and all subsequent
         contracts of whatever nature  except where otherwise is expressly agreed in writing by OWB

A 3      General trading conditions of another party will not apply  unless expressly accepted in writing by OWB

A 4      In the case that  for whatever reason  one or more of the (sub)clauses of these general conditions are
         invalid  the other (sub)clauses hereof shall remain valid and be binding upon the parties


**B**      **DEFINITIONS**

B 1      Throughout this document the following definitions shall apply

| | |
|---|---|
| Seller | means OWB  any office  branch office  affiliate or associate of the OWB Group  being the legal entity within the OWB Group  whose name is included in the Order Confirmation  sent to the Buyer |
| Buyer | means the vessel supplied and jointly and severally her Master  Owners  Managers/Operators  Disponent Owners  Time Charterers  Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers  quotations  orders and subsequent agreements or contracts have been made |
| Bunkers | means the commercial grades of bunker oils as generally offered to the Seller s customers for similar use at the time and place of delivery and/or services connected thereto |
| Owner | means the registered Owner  Manager or Bareboat Charterer of the vessel |
| Vessel | means the Buyer s Vessel  Ship  Barge or Off Shore Unit that receives the supply/bunkers  either as end user or as transfer unit to a third party |
| Nomination | means the written request/requirement by the Buyer to the Seller  for the supply of the Bunkers |
| Order Confirmation | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers  In case of conflict between the Nomination and the Order Confirmation  unless the Seller otherwise agrees in writing  the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement |
| Agreement | means the concluded terms for the sale/purchase of the Bunkers |
| Supplier | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers |
| GTC | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| BDR | means the Bunker Delivery Receipt  being the document(s)  which is/are signed by the Buyer s representative(s)  at the place of the supply of the Bunkers to the Vessel  evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel |


**C**      **OFFERS  QUOTATIONS AND PRICES**

C 1      An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order
         Confirmation to the Buyer  Each Order Confirmation shall incorporate these GTC by reference so that the
         GTC are considered a part of the Confirmation

C 2      Agreements entered into via brokers  or any other authorised representative on behalf of the Seller  shall
         only bind the Seller upon the Sellers  broker or other authorised representative sending the Order
         Confirmation to the Buyer or the Buyer s broker as the case may be

C 3      The Seller s offer is based on the applicable taxes  duties  costs  charges and price level of components
         for Bunkers existing at the time of the conclusion of the Agreement  Any later or additional tax
         assessment  duty or other charge of whatever nature and however named  or any increase of
         components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change
         in the Seller s contemplated source of supply or otherwise  coming into existence after the Agreement
         has been concluded  shall be added to the agreed purchase price  provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances

C 4     All prices and/or tariffs are exclusive VAT unless specifically stated otherwise  Any VAT or other charge and/or tax applicable and whenever imposed  shall be promptly paid by the Buyer  and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum

C 5     If the party requesting Bunkers is not the Owner of the Vessel  the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner  The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time  if such payment guarantee is not received upon request thereof from the Seller to the Owner  The Seller s decision to forego obtaining a payment guarantee under this Clause C 5 shall have no effect on Seller s right to a lien on the Vessel for any Bunkers supplied under this Agreement

C 6     The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel  and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement  If the party requesting Bunkers is not the Owner of the Vessel  Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery

C 7     If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory  the Seller may require cash payment or security to be provided by the Buyer prior to delivery  failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors


**D        SPECIFICATIONS (QUALITY – QUANTITY)**

D 1     The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel  The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose  and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise  This includes but is not limited to the quality sulphur content and any other specific characteristics of the Bunkers whatsoever  Any and all warranties regarding the satisfactory quality  merchantability  fitness for purpose  description or otherwise  are hereby excluded and disclaimed
Where specifications designate a maximum value  no minimum value is guaranteed unless expressly stated in the Order Confirmation  and conversely where minimum values are provided in a specification no maximum values are guaranteed unless expressly stated in the Order Confirmation

D 2     The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller s Order Confirmation  Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum

D 3     Where standard specifications are being given or referred to  tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever

D 4     In respect of the quantity agreed upon the Seller shall be at liberty to provide  and the Buyer shall accept a variation of 5% from the agreed quantity  with no other consequence than a similar variation to the corresponding invoice from the Seller

D 5     Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered  All grades of produce may contain petroleum industry allowed bio derived components


**E        MEASUREMENTS – NON CLAUSING OF THE BDR(S)**

E 1     The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge  tank truck or of the shore tank in case of delivery ex wharf

E 2     The Buyer s representative shall together with the Seller s representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made  When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied  Quantities calculated from the Receiving Vessel s soundings shall not be considered

E 3 Should the Buyer s representative fail or decline to verify the quantities  the measurements of quantities made by the Seller or the Supplier shall be final  conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance

E 4 The Buyer expressly undertakes not to make any endorsement  complaint/ comment (including but without limitation any  No lien  clausing) on the BDR when presented for signature by the Buyer s representative(s)  any such insertion shall be invalid and of no effect whatsoever

E 5 In the event of complaint/comment on the quantity of Bunkers delivered  the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately  followed by a complaint in detail to the Seller  setting out the exact quantity(ies) claimed shortsupplied  and with full supporting vouchers  in writing within 7 (seven) days thereof  failing which  any such claim by the Buyer shall be extinguished as non existent  and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier  the relevant claim being time barred  and the Seller/Supplier s weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered

## F  SAMPLING

F 1 The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation  The Buyer s representative has the responsibility to witness that such samples are drawn  correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles

F 2 In case that dripsampling is not available onboard the barge  tanktruck or shore tank  samples shall be taken as a composite of each tank from which supplies are made  onboard the barge (respectively at the shore tank or tanktruck)  divided with 1/3 from each the top  mid and bottom of the tanks

F 3 The samples shall be securely sealed and provided with labels showing the Vessel s name  identity of delivery facility  product name  delivery date and place and seal number  authenticated with the Vessel s stamp and signed by the Seller s representative and the Master of the Vessel or his representative  The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts  and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F

F 4 Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers  or if requested by the Buyer in writing  for as long as the Buyer reasonably required  The other two (2) samples shall be retained by the receiving Vessel  one of which being dedicated as the MARPOL sample

F 5 In the event of a dispute in regard to the quality of the Bunkers delivered  the samples drawn pursuant to this Chapter F  shall be conclusive and final evidence of the quality of the Bunkers delivered  One and only one  of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests  the result of which is to be made available to both parties  Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested  The parties are to use best endeavours to agree the independent laboratory to perform the tests  If  however  no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested  the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted  and those test result will be final and binding upon Buyer and Seller as set out above

F 6 The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present  or fails to be present at the appropriate time and place  and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking

F 7 No samples subsequently taken shall be allowed as (additional) evidence  If any of the seals have been removed or tampered with by an unauthorised person  such sample(s) shall be deemed to have no value as evidence

F 8 Any eventual samples drawn by Buyer s personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied  The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms  Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels

## G.        DELIVERY

G.1        The time of delivery, as given by the Seller, has been given as an approximate time, unless it has been otherwise specifically agreed in writing between the parties.

G.2        The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder, have been properly delivered to the Seller in reasonable time before the delivery. In the event the Nomination addresses a spread of dates for delivery, the Seller has the sole discretion to commence the delivery within any time, day/night/sshinc of these dates, always subject to the circumstances set out below in Clause G.3.

G.3        The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit, having regard to congestion affecting the delivery facilities of Seller, its Suppliers or Agents and to prior commitments of barges or other delivery means. The Seller and/or the Supplier shall not be liable for any consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion of bunkering, and unless otherwise agreed in writing, the Seller shall not be obligated to deliver prior to the nominated date or spread of dates. The Seller is not responsible for delays caused by local customs, pilots, port- or other authorities.

G.4        In any case the Buyer, unless otherwise agreed in writing, must give not less than 72 (seventy two) hours approximate notice of readiness of the Vessel for delivery, which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours such notices, where the last notice must also specify the exact place of delivery. All these notices must be given to the Sellers and the Seller's representatives/agents in writing.

G.5        The Seller shall be entitled to deliver the Bunkers by separate part deliveries, in which case each part delivery shall be construed as a separate delivery.

G.6        The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit required for such purpose has not been obtained in due time before the delivery.

G.7        If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that as a result thereof it may be unable to meet the demands of all its customers, the Seller may allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it may determine appropriate in its sole discretion.

G.8        The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit. The Seller and/or the Supplier shall not be liable for any demurrage paid or incurred by the Buyer or for any loss, damage or delay of the Vessel (consequential and/or liquidating damages included) of any nature whatsoever due to congestion at the loading terminal, prior commitments of available barges or tank trucks or any other reason.

G.9        The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery. If in the Supplier's opinion clear and safe berth is unavailable, delivery might be delayed or, in Seller's option, cancelled and all costs related to above will be on account of the Buyer.

G.10       The Vessel shall moor, unmoor, hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller, Seller's representative or Supplier, free of expenses and in any way as may be requested to assist the barge equipment to a smooth supply. The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel's bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery.
           During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the Vessel's own crew. Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are properly checked and ready to receive the bunkers, including but not limited to ensuring proper opening/closing of relevant valves, without any risk for spillages, etc. during the bunkering.
           Local further special requirements for receiving bunkers must be followed strictly by the Vessel, whether advised or not by the Seller or the Seller's representative, as it is always the Vessel and the Buyer who remains solely responsible for the knowledge and awareness of such eventual additional requirements for safety reasons.

G.11       In the event that the Vessel is not able to receive the delivery promptly, the Buyer is thereby in default and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof.

G.12       Delivery shall be deemed completed and all risk and liabilities, including loss, damage, deterioration, depreciation, contamination, evaporation or shrinkage to the Bunkers delivered and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank

G 13    If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered  the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price  The Seller may exercise this right without prejudice to the Seller s other rights for damages or otherwise pursuant to these conditions

G 14    The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers  and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer  The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment  for which the Bunkers are supplied  for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory  In the event the Bunkers are not considered satisfactory the Seller and Supplier are to be notified in writing immediately after such test period has expired  Otherwise  it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard

G 15    If delivery is required outside normal business hours or on local weekends  Saturday  Sunday  national religious or public holidays  the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs

G 16    In the event the Bunker delivery is made by vessel or barge as a ship-to ship transfer  any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident  is to be dealt with by the Owners directly with the owners of the units involved  and Seller/Supplier shall not be held nor be responsible for any such damages  If  however  any of the involved units choose to pursue Seller and/or Supplier  Buyer will fully indemnify and hold Seller harmless in relation thereto

G 17    For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe  taking weather  swell and forecasts into consideration  Supplier/Seller not to be held responsible for any delays  demurrages  liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection  Supplies being always performed weather permitting

G 18    Without prejudice to any other article(s) herein  any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded

## H        TITLE

H 1     Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery  The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non payment

H 2     Until full payment of the full amount due to the Seller has been made and subject to Article G 14 hereof the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller  and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel  nor mix  blend  sell  encumber  pledge  alienate  or surrender the Bunkers to any third party or other Vessel

H 3     In case of non or short payment for the Bunkers by the Buyer  the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention  without prejudice to all other rights or remedies available to the Seller

H 4     In the event that the Bunkers have been mixed with other bunkers on board the Vessel  the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered

H 5     The provisions of this Chapter H do not prejudice or in any way limit the Seller s right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable)  wherever situated in the world  without prior notice

H 6     Where notwithstanding these conditions  title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller  the Buyer shall grant a pledge over such Bunkers to the Seller  The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel  including any mixtures of the delivered Bunkers and other bunkers  Such pledge

will be deemed to have been given for any and all claims of whatever origin and of whatever nature that the Seller may have against the Buyer

H 7    For the avoidance of doubt where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement

# I    PAYMENT – MARITIME LIEN

I 1    Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing

I 2    Payment shall be made in full without any set off counterclaim deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s)

I 3    (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying the Seller may require immediate full payment of all its invoices due and/or those not yet due or such security as it shall deem to be satisfactory
(ii) In the event that the Buyer shall default in making any payment due the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs) or the Seller may in its discretion elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages including cancellation charges Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated
(iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates whereupon sub clauses I 3 (i) and I 3 (ii) shall apply as appropriate
(iv) Where the Buyer fails to pay timely the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim the Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer
(v) All judicial and extrajudicial costs and expenses including pre action costs fees expenses and disbursements of the Seller s lawyers/attorneys at law incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions shall be for the Buyer s account immediately payable by the latter to the Seller In case of litigation the Buyers shall also pay all the relevant expenses to the Seller including but without limitation all his reasonable attorneys/lawyers fees costs and disbursements

I 4    Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller If payment falls due on a non business day the payment shall be made on or before the business day nearest to the due date If the preceding and the succeeding business days are equally near to the due date then payment shall be made on or before the preceding business day

I 5    Any delay in payment of the full sum due shall entitle the Seller to interest at the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1 50 per mton supplied or the equivalent thereof in local currency with a minimum administration fee of USD 350 00 for each delivery made All reasonable attorneys fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer

I 6    Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order (1) costs of any kind or nature including but not limited to legal costs and attorneys fees (2) interest and administrational fee and (3) invoices in their order of age also if not yet due or in Seller s sole discretion to specify a payment to any such invoice Seller considers relevant

I 7    All costs borne by the Seller in connection with the collection of overdue payments including those of the Seller s own legal and credit department and including but not limited to reasonable attorneys fees whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer including but not limited to reasonable attorneys fees shall be for the sole account of the Buyer

I 8    The Seller shall at all times in its absolute discretion be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer s obligations under the Agreement Failing the immediate provision of such security upon Seller s demand the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security

I 9     Where Bunkers are supplied to a Vessel in addition to any other security the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof including but not limited to the reasonable attorney s fees) such maritime lien afforded to the Seller over the Vessel In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law be it of the place of delivery or the flag of the Vessel or the place of jurisdiction and/or an arrest of the Vessel or otherwise howsoever

I 10    It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer according to these ordinary business terms agreed between them

## J       CLAIMS

J 1     In addition to the obligations referred to in Article E 4 and E 5 herein any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer or the Master of the Vessel to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest If the Buyer or the Vessel s Master fails to present such immediate notice of protest to the Seller or Supplier such claim shall be deemed to have been waived and shall be absolutely barred for all purposes

J 2     Always without prejudice to Article G 14 herein any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes

J 3     The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions whether or not it has any claims or complaints If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied the Seller or the Seller s nominated representative shall be entitled to board the Vessel and investigate the Vessel s records log books engine logs etc and to make copies of any such document the Seller or the Seller s nominated representative may consider necessary for its investigations connected to the case The Buyer shall allow this or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel s officers and crew in any such manner the Seller or Seller s nominated representative may require Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel s officers and crew shall constitute a waiver of the Buyer s claim

J 4     The Seller shall be allowed and the Buyer Owner Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller s representative to draw samples from the Vessel s storage tanks settling tanks and service tank and/or from before and after the Vessel s centrifuges to have extra tests carried out for such samples at independent laboratory

J 5     In each and every case any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller

## K       LIABILITY – LIMIT TO SELLER'S LIABILITY

K 1     The Seller and/or Supplier shall not be liable for damages of whatever nature including physical injury nor for delay of delivery of Bunkers or services no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel representatives Supplier or (sub)contractors

K 2     Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time loss of cargo or charter cancelling date loss of income or profit/earnings are excluded In any event and notwithstanding anything to the contrary herein liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel

K 3    The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers its Supplier agents Servants (sub)contractors representatives employees and the officers crews and/or other people whether or not on board of the Vessel(s) The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions Third party shall mean any other (physical or legal) person/company than the Buyer

K 4    No servant supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss damage or delay while acting in the course of or in connection with its employment and/or agency for the Seller Without prejudice to the above every exemption limitation condition and liberty herein contained and every right exemption from or limit to liability defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant representative or agent of the Seller and/or the Supplier acting as aforesaid

## L.    EXEMPTIONS AND FORCE MAJEURE

L 1    Neither the Seller nor the Seller's Supplier shall be liable for any loss claim damage delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority or person purporting to act therefore or (b) when supply of the Bunkers or any facility of production manufacture storage transportation distribution or delivery contemplated by the Seller or Supplier is interrupted delayed by congestion or other event (also see Article G 3 above) or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption delay unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier including (without limitation) if such is caused wholly or partly by labour disputes strikes stoppages lock out governmental intervention wars civil commotion riot quarantine fire flood earthquake accident storm swell ice adverse weather or any act of God Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller s or the Supplier s normal practices Neither the Seller nor the Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time

L 2    If the Buyer exercises reasonable diligence the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure The Buyer shall indemnify the Seller or the Seller s supplier for any damage caused by the Buyer the Buyer s agent or employees in connection with deliveries hereunder

L 3    Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same However under no circumstances and for no reason whatsoever can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller

L 3    In the event that the Seller as a result of force majeure can only deliver a superior grade of bunkers the Seller is entitled to offer the said grade and the Buyer must accept delivery thereof and pay the applicable price

L 4    (a)    These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions In such circumstances these Terms and Conditions shall be varied accordingly and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party

(b)    Without prejudice or limitation to the generality of the foregoing in the event that the third party terms include

(i)    A shorter time limit for the doing of any act or the making of any claim then such shorter time limit shall be incorporated into these terms and conditions

(ii)    Any additional exclusion of liability clause then same shall be incorporated mutatis mutandis into these

(ii)    A different law and/or forum selection for disputes to be determined then such law selection and/or forum shall be incorporated into these terms and conditions

(c)   It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party

**M**        **BREACH/CANCELLATION**

M 1      Without prejudice to any other remedies and rights  the Seller shall have the option immediately to cancel the Agreement in full or in part  or to store or procure the storage of the Bunkers  in whole or in part  for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred  or to hold the Buyer fully to the agreement  or take any other measures which the Seller deems appropriate without prejudice to its rights of indemnification  without any liability on the side of the Seller  in any one of (but not limited to) the following cases

          a)      when the Buyer  for whatever reason  fails to accept the Bunkers in part or in full at the place and time designated for delivery
          b)      when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC
          c)      when  before the date of delivery  it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller
          d)      when  in case of force majeure  the Seller is of the opinion that the execution of the agreement should be cancelled

M 2      The Seller may terminate any Agreement with the Buyer in whole or in part  in its full discretion  upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment  ceases to carry on business  makes an arrangement with its creditors or undergoes any form of bankruptcy  administration  re organisation or asset rearrangement

M 3      The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller  in its sole discretion  has reasonable grounds to believe that

          a)      The Vessel or
          b)      The Charterer of the Vessel  or
          c)      The fully or partly Owner(s) of the Vessel  or
          d)      Any officers of the Vessel  or
          e)      The Operator and/or Manager of the Vessel  or
          f)      Any other person or entity in any way related to the Agreement or delivery is/are
          1)      Iranian(s)  or
          2)      Related in any way to Iran or Iranians  or
          3)      Listed on the US OFAC Specially Designated Nationals List  or
          4)      Covered by any US  UN  and/or EU sanctions  or
          5)      Covered by any sanctions of any other jurisdiction and/or administration

Under no circumstances can the Seller be held liable for any loss  delays  claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article
The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply
Should the Buyer breach its obligation to inform the Seller  the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach  including consequential or liquidated damages

M 4      The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law  including but not limited to the U S  Foreign Corrupt Practices Act ( FCPA )  and the UK Bribery Act  Therefore  the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not  and will not  offer  promise  pay  or authorize the payment of any money or anything of value  or take any action in furtherance of such a payment  whether by direct or indirect means  to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company  Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties  making any claims for payment  delivery or any other obligation of the Seller under this Agreement void  The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence

**N**        **SPILLAGE, ENVIRONMENTAL PROTECTION**

N 1      If a spill occurs while the Bunkers are being delivered  the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill  Without prejudice to the

generality of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller but at the expense of the Buyer to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action All expenses claims costs losses damages liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission If both parties have acted negligently all expenses claims losses damages liability and penalties shall be divided between the parties in accordance with the respective degree of negligence The burden of proof to show the Seller s negligence shall be on the Buyer The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller or is required by law or regulation applicable at the time and place of delivery

## O   DELAYS AND CANCELLATIONS

O 1   Notwithstanding anything else to the contrary herein and without prejudice to any rights or remedies otherwise available to the Seller the Buyer by its acceptance of these conditions expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date

O 2   If the Buyer for whatever reason (including circumstances entirely outside Buyer s control) cancels the Agreement where Order Confirmation has been sent by Seller the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation including but not limited to barge costs re storing of the Bunkers and hedging costs and also in Seller s sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or if another buyer cannot be found any market diminution in the value of the product as reasonably determined from available market indexes These losses and liabilities shall be indemnified by a minimum amount of USD 4 000 by way of agreed minimum liquidated damages and shall be indemnified in full if they in total exceed USD 4 000

## P   LAW AND JURISDICTION

P 1   This Agreement shall be governed and construed in accordance with English law
The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply
Except for circumstance referred to in Clause P 5 below all disputes arising in connection with this Agreement or any agreement relating hereto save where the Seller decides otherwise in its sole discretion shall be finally settled by arbitration in London England in accordance with the Arbitration Act 1996 (or any subsequent amendment)

P 2   In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller one by the Buyer and one by the two arbitrators already appointed Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the LLMA ) Either party may call for Arbitration by service of written notice specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s) then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator either party may apply to the English courts for the appointment of a third arbitrator
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise

P 3   Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator

P 4   In cases where neither the claim nor any counterclaim exceeds the amount of USD 100 000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced

P 5   The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien regardless of the country in which Seller takes legal action Seller shall be entitled to assert

its rights of lien or attachment or other rights  whether in law  in equity or otherwise  in any jurisdiction where the Vessel may be found

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them  any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port  place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York

P 6     If any procedure of any nature whatsoever is instituted under Clause P 5 above  in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement  the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys fees incurred in such proceeding

## Q        VALIDITY

Q 1     These terms and conditions shall be valid and binding for all offers  quotations  prices and deliveries made by the O W  Bunker Group  any associated company  representative or agent as of September 1 2013  or at any later date

Q 2     These terms and conditions are available at the website www.owbunker.com on which site as well the Sellers may notify amendments  alterations  changes or verifications to same  Such amendments  alterations  changes or verifications are deemed to be a part of the entire terms once same have been advised on the website

# EXHIBIT 4



# NOTICE OF ASSIGNMENT

19 December 2013

Dear Sirs

**English Omnibus Security Agreement dated 19 December 2013 between (amongst others) O W. Bunker &
Trading A/S and ING Bank N V  as Security Agent (the Security Agreement)**

This letter constitutes notice to you that under the Security Agreement we have assigned by way of security to
ING Bank N V  (the **Security Agent**) all our rights in respect of the supply contract between us as may be
constituted or supplemented by the OWB general terms and conditions as provided to you and as amended
restated or supplemented from time to time (the **Contract**)

We confirm that

(a)     we will remain liable under the Contract to perform all the obligations assumed by us under the
        Contract and

(b)     none of the Security Agent its agents any receiver or any other person will at any time be under any
        obligation or liability to you under or in respect of the Contract

We will also remain entitled to exercise all our rights powers and discretions under the Contract and you should
continue to give notices under the Contract to us unless and until you receive notice from the Security Agent to
the contrary  In this event all the rights powers and discretions will be exercisable by and notices must be
given to  ING Bank N V  or as it directs

We authorise and instruct you without further obligation to us to pay all amounts payable under any invoice
issued in respect of the Contract to the relevant account with ING Bank N V

| Entity | Bank account | IBAN |
|---|---|---|
| O W  Bunkers (UK) Limited | 02 01 18 031 | NL26INGB0020118031 |
| O W  Bunker Germany GmbH | | |
| O W  Bunker (Netherlands) B V | | |
| Bergen Bunkers AS | | |
| O W  Bunker (Switzerland) SA | | |
| O W  Global Trading SA | | |
| O W  Bunker North America Inc | | |
| O W  Bunker USA Inc | | |
| O W  Bunker China Limited | 02 01 17 981 | NL18INGB0020117981 |
| O W  Bunker Malta Ltd | 02 01 17 949 | NL09INGB0020117949 |
| O W  Bunker Far East (Singapore) Pte Ltd | 02 01 18 244 | NL95INGB0020118244 |
| O W  Bunker Middle East DMCC | 02 00 14 376 | NL67INGB0020014376 |
| | 02 00 23 413 | NL23INGB0020023413 |



Any amendment to these payment instructions may not be made without the express written consent of ING Bank N.V.. Any such payment by you will extinguish the corresponding payment obligation to us in respect of that particular invoice under the Contract.

This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Please acknowledge receipt of this letter by sending the attached acknowledgement to the Security Agent at ING Bank N.V.. Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP N 04 046) Attention: Agency Desk – Ops & IT Banking Wholesale Lending Operations Agency, with a copy to us.

Yours faithfully,


.......................................
Jim Pedersen

O.W. Bunker & Trading A/S


On behalf of:

O.W. Bunkers (UK) Limited
O.W. Bunker Germany GmbH
O.W. Bunker China Limited
O.W. Bunker Malta Ltd.
O.W. Bunker (Netherlands) B.V.
Bergen Bunkers AS
O.W. Bunker Far East (Singapore) Pte Ltd
O.W. Bunker (Switzerland) SA
O.W. Global Trading SA
O.W. Bunker Middle East DMCC
O.W. Bunker North America Inc.
O.W. Bunker USA Inc.



## NOTICE OF APPOINTMENT OF RECEIVERS AND ASSIGNMENT

To:        REDACTED


19 November 2014

Dear Sirs,

**English Omnibus Security Agreement dated 19 December 2013 between O.W. Bunker Trading A/S and certain of its subsidiaries (as Chargors) and ING Bank N.V. as Security Agent (the Security Agreement)**

*Appointment of Receivers*

1        Please be informed that Paul David Copley, Ian David Green and Anthony Victor Lomas, each of PricewaterhouseCoopers LLP, 7 More London Riverside, London, SE1 2RT United Kingdom (the Receivers) were appointed as joint receivers of the Security Assets (as defined in the Security Agreement) on 12 November 2014.

*Assignment*

2.        We refer to any notice(s) invoices or confirmations received by you pursuant to the Security Agreement (the Notices) under which you have been given notice that the relevant chargor or chargors as the case may be (the Chargor), has assigned by way of security to ING Bank N.V. (the Security Agent) all its rights in respect of all supply contracts with you as may be constituted or supplemented by the OWB general terms and conditions as provided to you and as amended, restated or supplemented from time to time (the Contracts), including without limitation the following unpaid invoices under the supply contracts as listed in schedule 1 to this letter

3.        This letter also constitutes notice to you that under the Security Agreement the relevant Chargor has assigned by way of security to the Security Agent all its rights in respect of the Contracts.

4.        You must pay all amounts payable under any invoice issued in respect of the Contracts to the account with ING Bank N.V. specified in that invoice.

5        Any amendment to these payment instructions may not be made without the express written consent of the Security Agent. Any payment by you to an account with ING Bank N.V. specified in an invoice will extinguish the corresponding payment obligation to the relevant Chargor in respect of that particular invoice under the relevant Contract.

6.        **Please note that any payment by you which is not made in full compliance with the payment instructions in this notice will NOT extinguish the relevant payment obligation to the relevant Chargor in respect of invoices under the relevant Contract and you will remain fully liable for all amounts outstanding.**

*Miscellaneous*

7.     The relevant Chargor:

    (a)     remains liable under the Contracts to perform all obligations assumed by it under the Contracts; and

    (b)     none of the Security Agent, its agents, the Receivers or any other person will at any time be under any obligation or liability to you under or in respect of the Contracts.

8.     Notwithstanding that the accounts specified in an invoice are held in the name of a Chargor (as an administrative matter), the underlying receivables are being collected by the Security Agent and any payment to any such account therefore constitutes a payment to the Security Agent and does not constitute a payment to that Chargor.

9.     All rights, powers and discretions of the relevant Chargor under the Contracts are now exercisable by, and notices must be given to, ING Bank N.V. or as it directs.

10.     This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Please acknowledge receipt of this letter as a matter of urgency by signing the acknowledgement and sending a copy of the signed letter back to the Security Agent at ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code. AMP N 04 046) Attention: Agency Desk - Ops IT Banking Wholesale Lending Operations Agency.

If you have any questions in relation to this letter please contact Alina Klarner at PricewaterhouseCoopers LLP on +447922226044 or alina.klarner@uk.pwc.com.

Yours faithfully,

**SIGNED by Paul David Copley for and on behalf of the Chargor as the Chargor's agent and without personal liability pursuant to powers granted in the Security Agreement including the power contained in Clause 17 (Power of Attorney) of the Security Agreement.**



Signed by ING Bank N.V. (in its capacity as Security Agent) for and on behalf of the Chargor pursuant to the powers granted in the Security Agreement including the power contained in Clause 17 (Power of Attorney) of the Security Agreement.

We hereby acknowledge the terms set out above

REDACTED

# EXHIBIT 5

.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| NUSTAR TERMINALS MARINE SERVICES N.V. | § § § | |
| Plaintiff. | § § § | Civil Action No. _____ |
| v. | § § | Filed under Rule 9(h) Fed R. Civ. P. |
| LNG FINIMA, IMO No. 7702401, her engines, freights, apparel, appurtenances, tackle. etc.. *in rem*. | § § § § | ADMIRALTY |
| Defendant. | § § | |

### PLAINTIFF'S FIRST ORIGINAL VERIFIED COMPLAINT

NOW COMES Plaintiff. NUSTAR TERMINALS MARINE SERVICES N.V.
(hereinafter "NuStar" or "Plaintiff"). against the LNG FINIMA. IMO No. 7702401. her engines.
freights. apparel. appurtenances. tackle. etc. (hereinafter "LNG FINIMA" or "the Vessel"). *in
rem*. and alleges and pleads as follows:

#### JURISDICTION AND VENUE

1.      Subject matter jurisdiction of this Honorable Court is based upon 28 U.S.C. §
1333 and the Commercial Instruments and Maritime Lien Act ("CIMLA"), 46 U.S.C. §§ 31301-
31343.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

2.      This is a case of admiralty and maritime jurisdiction as hereinafter more fully
appears, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal
Rules of Civil Procedure.  Plaintiff invokes the maritime procedures and special relief provided
in Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal
Rules of Civil Procedure for the arrest of the LNG FINIMA.

3.      Jurisdiction is founded on the presence within the District (or soon to be within the District) of the LNG FINIMA, which may be arrested and attached in accordance with the provisions of Rule C, as pled below.

PARTIES

4.      At all times material hereto, NuStar was and still is a Netherlands corporation, with its head office at Tumbledown Dick Bay, P.O. Box 170 St. Eustatius, Caribbean Netherlands.

5.      Defendant LNG FINIMA, IMO No. 7702401, her engines, freights, apparel, appurtenances, tackle, etc., is registered under the laws of Bermuda, and is and will be within the jurisdiction of the United States and this Honorable Court during the pendency of this action.

FACTS

6.      NuStar brings this action in order to recover amounts indisputably due and owing to it under a maritime contract for the supply of bunkers to the Vessel (hereinafter the "Sales Agreement"). A Copy of the Sales Agreement is attached hereto as Exhibit A.

7.      The Sales Agreement is between NuStar and an entity named O.W. Bunker USA, Inc. (hereinafter "O.W. Bunker"), which was acting as agent for the Vessel when it entered into the Agreement. *Id.* Additionally, the vessel's chief engineer procured the bunkers for the vessel as demonstrated by his signatures on the bunker delivery receipt and accompanying documents and is an officer appointed by the vessel, all in accord with CIMLA, 46 U.S.C. §31341(a)(4). See also Exhibit "C" hereto.

8.      The Sales Agreement expressly incorporates NuStar's General Terms and Conditions. Clause 1(c) of NuStar's General Terms and Conditions states that where bunker fuel is purchased by an agent on behalf of a principal, both the agent and the principal "shall be bound by and liable for all obligations as fully and as completely as if they were both the

- 2 -

principal, whether such principal be disclosed or undisclosed, and whether or not such agent purports to contract as agent only." *See* Exhibit "B", Nustar's General Terms and Conditions.

9.     The Sales Agreement, bearing the Contract No. 40213267 and entered into on or about October 24, 2014, called for the delivery of 3,600 metric tons of bunker fuel to the Vessel on or about October 29, 2014 at St. Eustatius. See Exhibit "A".  The Sales Agreement requires payment for the bunkers within 30 calendar days of delivery and provides for the accrual of interest on any late payments. *Id.*

10.     In accordance with the Sales Agreement, NuStar delivered bunkers to the Vessel on or about October 31, 2014, at St. Eustatius.  Additionally, on November 1, 2014, NuStar delivered 80.026 metric tons of marine gas oil to the Vessel.  In connection with the delivery, a Marine Fuel Delivery Note was signed by the Vessel's Chief Engineer and stamped with the "Ship Stamp" of the Vessel.  See Exhibit "C."

11.     The total amount owed by the Vessel and her agent, O.W. Bunker, to NuStar for these deliveries is USD $2,456.997.27.  See Exhibit "A" Invoice No. 90430983.

12.     Under the 30-day payment term of the Sales Agreement, the payment deadline for the November 1, 2014 delivery is December 1, 2014.   While this payment is not yet past due, O.W. Bunker, the Vessel's agent, advised NuStar that it will not be making the required payment. Furthermore, O.W. Bunker and its United States affiliated companies have filed for bankruptcy in Connecticut and have advised the Bankruptcy Court that liquidation is expected, which is presumptively indicative of insolvency. NuStar has no expectation that it will ever receive payment for the amounts due and owing from O.W. Bunkers. O.W. Bunker and the Vessel have therefore anticipatorily repudiated and breached the Sales Agreement.

13.     By signing and stamping the Marine Fuel Delivery Notes, the Vessel's officers and representatives acted on behalf of the Vessel and her Owner and/or Operator to procure bunkers, and thereby accepted the bunkers on behalf of, *inter alia*, the Vessel in compliance with the CIMLA, 46 U.S.C. §§ 31301-31343.

14.     The said bunkers delivered to the Vessel were necessary to the accomplishment of her mission; to wit: the movement of cargo in international trade.  The Vessel's representatives at the time of the bunker deliveries discussed herein were authorized to order necessaries for the account and on the credit of the Vessel.

15.     The Vessel has received the benefit of the aforementioned bunker deliveries and is indebted to NuStar and obligated to pay for the aforementioned goods and services.

16.     NuStar performed all conditions precedent to warrant full and complete payment for the aforementioned services.

17.     As a result of the foregoing, NuStar has a maritime lien on the Vessel for the provision of necessaries, *i e* bunker fuel, enforceable in admiralty in accordance with the provisions of Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims.

18.     Additionally, Clause 13 of NuStar's general Terms and Conditions (Exhibit "B"), incorporated into the bunker Sales Agreements (Exhibit "A"), provides that "[i]n the event [NuStar] institutes legal proceedings for collection of payment not made by BUYER[1] when due, all expenses incurred by [NuStar] in connection with such proceedings (including, without limitation, attorneys' fees and court costs) shall be for the BUYER'S account."  To date, NuStar has incurred and continues to incur legal fees.  NuStar will supplement at a later date with a full accounting of its legal fees for this matter.

---

[1] The Terms and Conditions define "BUYER" to include both agent and principal.

19.     Payment of all sums has been duly demanded by NuStar from the Vessel and its Owners.  However, to Date, the Vessel has neglected, failed or otherwise refused to pay the outstanding aggregate sum of USD $2,456,997.27 plus interest and fees, which is indisputably due and owing to NuStar for the bunkers under the relevant Sales Agreements.  Furthermore, due to O.W. Bunker's bankruptcy and insolvency, O.W. Bunker has anticipatorily repudiated and breached the bunker supply agreement it reached with NuStar.  Such conduct gives rise to NuStar's maritime lien claim against the vessel LNG FINIMA.

<u>ALLEGATIONS IN SUPPORT OF VESSEL ARREST</u>

20.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1" through "19" and incorporates those allegations herein.

21.     As a result of the Vessel's failure to pay the amounts owed to NuStar for the bunkers supplied to the Vessel, under the terms of the Sales Agreements, NuStar's claim for the amount of USD $2,456,997.27 plus interest and fees attaches a maritime lien on the Vessel in favor of NuStar and is enforceable with suit *in rem*.

22.     Accordingly, NuStar seeks to enforce its maritime lien, pursuant to Rule C of the Supplemental Admiralty Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions.

WHEREFORE PREMISES CONSIDERED, NuStar prays as follows:

A.      That process in due form of law, according to the practice of this Honorable Court in cases of admiralty and maritime jurisdiction, issue against the LNG FINIMA, citing it to appear and answer under oath all, and singular, the matters, alleged in the Verified Complaint;

B.      That a warrant for the arrest of the LNG FINIMA be issued and that the Vessel be seized by the U.S. Marshal to be held as security against any judgment to be entered herein against the LNG FINIMA, her engines, freights, apparel, appurtenances, tackle, etc., *in rem*;

C.     That after due proceedings, judgment be entered in favor of NuStar and against the LNG FINIMA, her engines, freights, apparel, appurtenances, tackle, etc., *in rem*, for the amount of USD $2,456,997.27 as well as for contractual pre-judgment interest, post-judgment interest, costs, attorneys' fees, and disbursements for this action;

D.     That the LNG FINIMA, her engines, freights, apparel, furniture, equipment, appurtenances, tackle etc., after her arrest be condemned and sold, free and clear of all liens and encumbrances, to satisfy the judgment, and that the Court award NuStar out of the proceeds of the said sale, the full amount of its claim, together with interest, costs, and attorneys' fees; and

E.     That the Court grant NuStar such other and further relief as may be just, equitable, and proper.

Dated:  November 25, 2014             Respectfully submitted,
        Lake Charles, LA


                                      *s/Stephen C. Hanemann*
                                      **BRADLEY J. SCHLOTTERER (#24211)**
                                      **STEPHEN C. HANEMANN (#28069)**
                                      **TERRENCE D. McCAY (#26410)**
                                      909 Poydras Street, Suite 3600
                                      New Orleans, LA 70112
                                      Telephone: (504) 585-3050
                                      Facsimile: (504) 585-3051
                                      Email: stephen.hanemann@keanmiller.com
                                      *Attorneys for Plaintiff*
                                      NuStar Terminals Marine Services N.V.

RECEIVED
IN LAKE CHARLES

NOV 26 2014

TONY R. MOORE, CLERK
BY _____
             DEPUTY

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF LOUISIANA

NUSTAR TERMINALS MARINE §
SERVICES N.V., §
§
    Plaintiff, §  Civil Action No.
§  2:14-cv-03335
v. §
§  Filed under Rule 9(h) Fed. R. Civ. P.
§
LNG FINIMA, IMO No. 7702401, her §
engines, freights, apparel, appurtenances, §  ADMIRALTY
tackle, etc., *in rem*, §
§
    Defendant. §

### ORDER AUTHORIZING THE ISSUANCE OF WARRANT OF ARREST

ON THIS DAY, the Court considered the Motion for Issuance of Warrant of Arrest filed by Plaintiff NUSTAR TERMINALS MARINE SERVICES N.V. The Court, having reviewed the pleadings, is of the opinion that the relief sought is proper and it is therefore:

It is therefore **ORDERED, ADJUDGED** and **DECREED** that a Warrant of Arrest be issued against the LNG FINIMA, IMO No. 7702401 her engines, freights, apparel, appurtenances, tackle, etc. ("Vessel"); and

**IT IS FURTHER ORDERED** that the United States Marshal Service for the Western District of Louisiana seize the Vessel, serve a copy of this Order, the Original Verified Complaint with the said Warrant of Arrest, and the "Summons in a Civil Action" on the person in charge of the Vessel or her agent, and return the warrant promptly; and

**IT IS FURTHER ORDERED** that the U.S. Marshal is authorized to allow, at the risk and expense of the Vessel's owners, to continue any normal operations, including the conduct of repair works, cargo or passenger operations, and shifting to another berth, but always within the Western District of Louisiana and subject to the Court's jurisdiction; and

**IT IS FURTHER ORDERED** that the Vessel may be released from seizure without further order of this Court if the Marshal receives written authorization from the attorney who requested the seizure, and that such attorney advises that he has conferred with all counsel representing all of the parties to the litigation and they consent to the release, if the attorney files the consent and the Court has not entered an Order to the contrary.

SIGNED at Lake Charles, Louisiana this 26th day of November 2014.

_____
UNITED STATES DISTRICT/~~MAGISTRATE~~ JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| NUSTAR TERMINALS MARINE SERVICES N.V., | § § § | |
| Plaintiff, | § § | Civil Action No. |
| v. | § § § | _2:14-CV-3335_ |
| LNG FINIMA, IMO No. 7702401, her engines, freights, apparel, appurtenances, tackle, etc., *in rem*, | § § § § | Filed under Rule 9(h) Fed. R. Civ. P. ADMIRALTY |
| Defendant. | § § | |

## WARRANT OF ARREST

TO:   U.S. MARSHAL OF THE UNITED STATES COURT FOR THE WESTERN DISTRICT OF LOUISIANA

In the name of the United States District Court for the WESTERN DISTRICT OF LOUSIANA, you are commanded to arrest the vessel, LNG FINIMA, IMO No. 7702401, her engines, freights, apparel, appurtenances, tackle, etc., which is or will shortly be present at the Port of Lake Charles, Louisiana.

YOU ARE HEREBY further commanded to serve a copy of the First Original Verified Complaint, the Order Authorizing the Issuance of Warrant or Arrest, and this Warrant on the person in possession of the vessel or his agents, and promptly return your writ.   The Vessel may continue to load and/or unload and/or shift berths or anchorage

areas while under seizure, all at the risk of Vessel's interests, but always within the Western District of Louisiana and subject to the Court's jurisdiction.

Dated: __ *11-26-14*

_Tony R. Moore_ , Clerk

United States District Court
Western District of Louisiana

By: _JoAnn Benoit_
Deputy Clerk